The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Thomas M. Harris presiding. Good morning, this is case number 4-23-0736 Langston v. Catt et al. Council, we'd like to first start with appearances. First for the appellant. Jeffrey Nepple, that's N-E-P-P-L for Isis Langston and James Langston. All right, thank you. And for the appellees. Good morning, my name is Gretchen Sperry and I represent Dr. Catt and Affinity Medical Group. Good morning, Your Honors. Kathryn Weiler on behalf of OSF Healthcare. All right, thank you. Mr. Nepple, as appellant, you may proceed with your argument. Thank you, Your Honor. Let me get my stuff organized here. Your Honor, this is a medical malpractice case that was brought by my clients during an unfortunate time in our world and in our life's reality, I guess. The case was initiated just post the pandemic catastrophe that existed in our world. This is relevant to this case because, amongst other things, the abilities to get access to discovery that we needed to have analyzed by medical healthcare professionals to see if we had a decent lawsuit here or not, in other words, one that we should be filing or not filing, took longer than normal. And by my recollection, we attempted to retrieve these medical records informally before the lawsuit began. Mr. Nepple, may I interrupt you here for a moment? And I'd like clarification as to two dates. And if they're not, if you can't pinpoint dates, that's fine, but give us a rough time. When did you initiate what you're calling informal discovery in this case? And when was the first pleading filed? When was the first complaint filed? The first came to us about a month ago. Top of my head, I don't have the petition. I know it's part of the record, the date of the petition, but I can look it up quickly and I can get back to you in very short order. I'm sure it's referenced in here somewhere on the docket, your honor. But I can tell you that during the fall of 21, in anticipation of the need to file this in 22, we did engage in further exchange of documents with counsel for, I believe, the hospital. And he was very kind. He was. And he sent me documents. My son was working for me at the time. He sent them to him. And we requested additional documents and then the holiday season happened. Several months passed. And then we went back out to counsel and he then gave us everything that he quote, unquote, had for our use. One of the things that we did receive was an email link to a website where we can go grab our documents. And when attempting to do that, upon pressing the button, which was contained within the email, it took us to different places, all of which is the conclusion that certain documents were still missing. But yet we get to the hearing. In this case, having explained that the documents that we were referred to in that email link were so disorganized that we had to actually hire a nurse practitioner who works for us as an independent contractor to go through documents to reorganize those documents in a manner that might make sense. The real problem in this case is although counsel was prior extensions and so forth, the real problem in this case is my expert did not get the report back to me until the date it was due to be filed with the court. In her report, which they attack, which they say is deficient, they don't like some of the language that she used. And I think to a degree, they get a little bit confused about some of the points made by the doctor. In her report, she did a very lengthy analysis identifying many different forms of medical or professional negligence in the sense that duties and breaches of the standard of care were identified. Where I believe she made the mistake was based upon the frustrations of looking over the medical records, she said, I see other examples of where medical records should be present. Let's do the operative the post-operative notes. On the link that I was provided, and I tried to explain this to the trial judge after defense counsel put up a very nice presentation about how you can use this Adobe to go in and basically have the records organized for easy. Put this up on the stand for the first time in our oral argument on the motion to dismiss that link. Yes, sir. How much time lapsed between the time you first started looking at the records and finding them to be difficult to read and the hearing? This is an ongoing problem. I'm going to say opposing counsel wasn't. I'm not going to say he didn't try to get me all his records, but the dilemma was we never engaged in formal discovery. Okay. That's not my question. The question is, how much time lapsed between the time when you got records and you started trying to look at them and found that you were having difficulty and then the ultimate hearing where you were shown this Adobe app? Yes, I can get through that. So we, as I said, we're engaging in formal discovery and in a very kind manner going back and forth with the opposing counsel. I'm trying to save you time. I'm trying to save you time. Yeah. We can cut those. Yes, your honor. How about I get right to the point then? In early 23, we finally had what he, meaning opposing counsel gave to us, which was allegedly an absolutely complete set of the records. And we were sent this link that would have been in the spring of 23, I believe. And then following that, they were sent along to our expert who did not get them back to us until the date that report was due. The time between when you got the records and the time and the hearing. Yes. All right. So we produce, I'm sorry, the records were shared with us. We certificate on the day it was due. And then in response, a motion to dismiss was filed by the defendants, both. And then after the motion was dismissed, we proceeded forward for hearing. I did not ask for any additional documents. Am I not getting your question? Honestly, we're taking up so much of your time here, just trying to get you to answer a very simple question. Yes. I don't know the exact dates. All I need to know is the time between when you received the records and the date of the hearing. Give me a rough idea. It would have been when it had been several months. It wasn't years by any means. I just don't remember the exact dates off my head, Your Honor. No problem. I just needed a rough idea. In those intervening months, did you ever contact counsel and advise them of the problem you were having in trying to research these records? Yes and no. Now, the trial court made a very good point about that. And he asked me just that question. You couldn't find the post-operative notes. Did you call opposing counsel and ask him where they were? And I did not. And the reason is this. We had gone through record exchanges with opposing counsel. We had gone through record exchanges on several occasions. We had been sharing documents back and forth. And I believed him. He said he sent me everything that he had. Now, granted, we had the same problems when we were trying to get records prior to litigation. And they came to us in a very disorganized way. And we were looking into additional causes of action. Because if certain documents weren't there that were required to be there, then I might have additional claims to be made. When he referred me that I had every document, I had no reason to doubt his veracity of his statement. Since we had engaged in a very congenial discovery exchange, I had no reason to believe he had given me everything, not done discovery yet, because you're at the motion to dismiss stage. So I mean, I guess I relied upon us talking, us being told by defense counsel that we had everything they could possibly give us for assistance in analyzing this case. And I relied upon that. I wasn't asking about the quality. I wasn't asking about the quantity. Yes. I was asking about the quality. Did you explain to counsel that you were having difficulty trying to find these documents within whatever it was you received? At the top of my head, I believe communications were sent to Mr. Brandt. I'm sorry if I have his name wrong, was sent to opposing counsel. I stated his name wrong. An email was sent to opposing counsel explaining the difficulties we were having and some of the additional documents that we yet did need. And then in response to that, he says, I'm just going out of an abortion, sends you everything once more. Now, I believed him when he said he sent me everything. And I'm not assigning fault to Kim, if the hospital did not maintain the system correctly, or if they don't give us access to locating medical records, because I can tell you, I had a doctor, a nurse practitioner, another doctor all look within this management system and the button we, and we went into showed us there were no reports. Now, counsel put an Adobe product on the screen. And he was able to show a different method to get these documents. But none of those instructions were given. In his response, he just we said, press this button. He didn't say you need to download an Adobe product. And when we get to the hearing is the first time I ever hear about this Adobe product. So is this defense counsel's obligation to show you how to use this Adobe product? I mean, did you not open up the records and look at them before you send them on to your expert? I think that's my point. Defense counsel sent me an email, press this button, it will take you to your records was within the email. So I followed his instructions. His instruction did not include a statement that said, for you can read these documents, because we were able to get documents, they were very disorganized fashion, we had to put them back together, they were coming from multiple sources as doctors exchanging things. And we put them together. I mean, if I had the absolute ability to open it, and it was as easy as counsel showed us, I would have saved myself a lot of money hiring experts to reorganize records. Because when we follow the instructions that were given to us, we did not receive the same sort of access to which was shown on your jacket. And I emphasize strongly, once in the communications from opposing counsel, did we ever receive information that we needed something unique to open it. Now, when we opened it, we printed what it gave us. We weren't told we have to go another level higher to basically open which they gave us. And I think that would be as opposed to the old days when we bait stamped and exchange records, which we could absolutely know somebody's seen, at the very least, something should have been done to explain to us how they wanted us to review their records. I mean, I guess, do I have to go out and buy an Adobe product? Okay, I will. Mr. Neville, may I interrupt you for a moment? Yes, yes. I'm assuming that this is not the first case in which you have had a client with medical records that you reviewed. Is that correct? That is correct. It's the only one I've ever had this problem. Okay. But you knew that this client had undergone surgery?  Correct. And you know, when you first received these electronic records, that you did not see any post-op notes or records? A lot of things, Your Honor. Could you repeat that? Yes, we were missing a lot of things. Yes. Okay. And he said, you know what, I'll do this every once more. I'm not suggesting he was being obstreperous or mean or... You don't need to add the editorializing here, just simply if you could answer that. So, how much time passed from the time that you first recognized that there were no post-operative notes to the time that the complaint was filed? When we were granted leave to submit additional support as in for our 622 disclosures from the doctor, when we were given leave, it was a short window for us to then get everything that once again was provided us over to our expert. The expert gave it back to us the day it was to be filed. So, the exact timing... Can I interrupt you a moment? I need to re-ask this. How much time passed from the time that you recognized that there were no post-operative notes in what you received to the time that the complaint was filed? And the complaint was filed in August of 2022. You mean the new certificate that was filed? How much time passed from the time that you first recognized there were no post-operative notes in what you were provided to August 2022? A month to most. But at that point, I had abandoned requesting records from opposing counsel because for two reasons. Number one... Can you repeat that? Did you say a month to two months before the August 22nd? Yes. And at that time, I was reaching out to the expert. Counsel, you indicated that you began informal discovery in fall of 2021. Yes. So, what happened between fall of 2021 and what might have been May or June of 2022? This is where it does make more sense, I hope, for this panel. That in the months of November or December, I can't recall which, we reached out to opposing counsel saying that there were some deficiencies in the records that we had located and we needed to have him supplement what he gave us. We were doing that on an informal basis. And so, time passed. It was the holiday season. I'm not trying to be rude. And I gave him time to get through the holidays. And there's an email that was attached and shown at the hearing where he says, yeah, I know. I'm so sorry. I forgot. So, three or four months passed between the time we needed the records and when we got them. Then we were granted leave and a short window by which to get everything done. And I'm interfacing with an expert in Chicago forwarding records as they come in. And honestly, trying to push her. And she gets me the thing in time, but she doesn't write it with the exact language that they are asking for. Case that I provided says that there's technical difficulties, but there's some substances there. The case that says if you put two doctors together, the court could just allow you to submit two separate reports because we should try cases, not get them thrown out by technicalities. Isis Langston went through a lot. She's a good person. She doesn't need to be thrown out of court because of a technicality over wording in a document. I think our document more than adequately sets forth the reasons why we think this lawsuit is legitimate. It is backed by an appropriate doctor to do that analysis. And as pointed out in our response of pleadings to the motion, I'm sorry, to the motion file and in our presentation to this court, that they knew what the basis of the allegations were, but they didn't like things like we didn't use certain terminology that we believe a lawyer should be putting in such as proximate cause analysis. The substance is in there about the mistakes that were made. They just don't like the language that I chose to use. Honestly, I've never had in all the malpractice cases I've done, somebody be thrown out of court for nitpicking as it would pertain to something like a lawyer proximate cause of the question or the injury. I mean, the substance is in there, which is out. She made definitive statements about reaches of the standard of care. They just don't like my format. And it would seem to me that interests of justice would be served by allowing us to simply use the language they want me to use, which isn't a problem. And then upon that timeframe, I don't think there's an objection. Referring to your language, but you're referring to Dr. Bodnar's 226 report. I'm sorry. You're correct. That's her language. That's her language. And they were criticizing her language saying she didn't have the proper terminology in there, which we felt would be unethical to ask her to make a proximate legal analysis. I mean, that's a term of legal art within a reasonable degree of medical certainty. Can you connect it up? She defined what were the breaches of standard. She aligned those to the problems that were happening. And she gave a causal connection analysis. She just didn't use the right words. If you read their brief, that's the major complaint is they don't like terminology. And they also go on to say that she says there are other causes of action, which might be there if she has additional. But she did identify certain causes of action that were definitely there without those records. I think she was just trying to be thorough and say that, hey, I get these other records, which I now know I need, I might say something more. But she did say in her report that there were breaches of the standard of care and that she believes they were the cause of the injuries and conditions of ill-being being suffered by my client. I was never previously under any sort of discovery sanctions order. I was never given an order to comply by date certain or I would face a penalty and sorts. Here, it appears to be more form or substance. And if my substance is adequate to provide adequate notice about the allegations being made, I don't see why form should be to deny my client access justice when my client from Mexico doesn't have the greatest command of the English language. She moved here. She needed this surgery. She trusted these people, but her ability to grasp what goes on is somewhat limited. My ability to get help from her is somewhat limited. But I fall on the sword here. And at this panel, if the ladies and justices of this panel believe I did something wrong, and because of my inability to manage technology, or that maybe it was a mistake. I'm not trying to say they did something potentially wrong, but I don't think anybody has here. Everybody knows what I'm trying to say these doctors did wrong. And I have given them substance of what they need. They want me to change a few words there. I have the ability to do that because I know that proximate cause does exist. And if that is appropriate, I'll put it in the document. I just don't want to be provided no access to justice, because I didn't understand technology well enough. And they say I didn't understand it well enough that I have to believe but that doesn't seem to be the safer way would have been sent the documents like we always have done if necessary. Pick up the phone and call opposing counsel and try and work this out. I did that after he reassured us after the third, second or third time. Hey, look, I don't know what you have or don't have. I'm getting for you everything. And I'm going to send it to you. So why would we then question he was wrong because we have been working with him nonstop in the of the year prior through February or subsequent there. And it was at that time when he hadn't been able to get back to us after Christmas holiday. We spoke once more. And he said, Doc, you got you everything, which it then it didn't surprise me. They came orders, whatnot. But I have staff here, which I employ full time as a nurse practitioner and a contractor to go through these records. She went through with Dr. Bordner. Things weren't making sense to them. We looked at records. There's no postoperative notes. This is the potential for another cause of action. Why would I call the other lawyer and say, I'm going to sue you, by the way, I might have found something else they did wrong, was my thought. I don't usually for lawsuit. But what she did do was say, thank you, Joe. Counsel, your time is up. I'll ask my colleagues if they have any other questions. No. Yes. Other questions? No. All right. Is going to be Miss Barry, are you going to be proceeding with your argument first? Yes, Your Honor. All right, you may proceed. Thank you. And if I might just take a moment to thank the court and counsel for accommodating the last minute schedule change on the 30th because of illness. I appreciate that. Thank you. Of course. No problem. Again, my name is Gretchen Sperry. I represent Dr. Katt and the Affinity Defendants. I do happen to have the information that Justice DeArmond was asking about the dates. And if it would be helpful to guide the rest of the conversation here, I can provide you with those. You'll see at C313 of there's an email exchange at which time on February 10th, 2023 is when plaintiff received. In fact, it's undisputed that that is the time at which plaintiff received the entire set of medical records. The communications began, I think counsel mentioned sometime in fall of 2021. The communications continued December 2021 through February 2022. And the, I'm sorry, February 10th, 2022. And the supplemental 2622 report was filed by plaintiffs and Dr. Bodnar on April 10th, 2023. The hearing in this case was July 20th, 2023. So that helps set up the timeline. I'd also like to take a step back and just consider where we are in terms of the procedure of this case and the way that this court analyzes challenges to 2622 reports and the sufficiency of the complaints that they are attached to. This is a threshold issue. Section 2622 provides very strict requirements on what a medical malpractice plaintiff must include with their complaint to establish that they have advanced reasonable and meritorious claims that have been evaluated by a medical professional. This, the suggestion that the particular language used that proximate cause is a mere technicality or a vague wording is directly contrary to the many, many courts who have interpreted the requirements of section 2622. Well, are you suggesting that a physician has to use the words proximate cause to submit a valid 2622 report? Not, there are no magic words required, Justice Harris. It's more that in very similarly as the Illinois Supreme Court discussed in DeLuna versus St. Elizabeth's Hospital, it's akin to the same way that medical experts are required to provide that kind of testimony to establish the claims in the course of proving the allegations. It is, judges are not doctors and they rely on the medical professionals reviewing the medical records to establish that there is a well-founded factual predicate for the allegations and legal filing. And because you are splitting the time, Ms. Sperry, and your time is going to be short here, you're addressing the sufficiency of the 2622 report as it relates only to cat and affinity or overall? This is to all defendants, Your Honor. The parties cross-adopted each other's motions to dismiss, but the arguments that we make would be applicable to both defendants as it is. Dr. Plotner indicated she did have records for the operation itself, just didn't have the post-operative records, is that right? That is the argument that plaintiffs have made. I'm looking at her report and she indicates that she has reviewed the operative report and notes, so is that incorrect? Yes, Your Honor, and counsel for OSF in briefing on the motion to dismiss did a very detailed analysis of the allegations in the complaint compared to the reports that Dr. Bodner produced. And, of course, we're talking about the second amended complaint and the amended report that were both filed in April. And, for example, on C320 of the record, for example, there are instances at which Dr. Bodner says she's certain post-operative notes. If you could just confine your argument to the records that relate, that are intraoperative or pre-op. Correct, and on 320, counsel puts in his motion and attaches exhibits that show that those records, the post-op records that she claims that she is missing, actually are in the complete medical file that plaintiff's counsel received on February 10, 2023. Again, and I may not be making myself clear, Dr. Bodner indicated in her report that she reviewed the intraoperative record, which would be Dr. Katz's operative notes and those that relate to the operation itself. She indicates she hasn't seen post-operative records, but are you saying that that assertion by her as to what she did review is inaccurate? That's exactly what I'm saying, Justice Harris. And there are pages C319 through 23, there are numerous examples and they fall sort of into three categories. These are the inconsistencies that the trial court ultimately identified when ruling on the motion in July of 2023. And the categories are Dr. Bodner claiming that she does not have documents that are actually in the full record that no one disputes plaintiff's counsel had by that time. There are instances where Dr. Bodner alleges that there are applicable standards of care, but does not identify to whom they apply, how they were breached, and how such alleged breach caused the ultimate injuries. And to the extent that there are any properly stated standards of care, there are a couple, and I'll provide examples, the lines immediately preceding those assertions show precisely the opposite. And I'll give you an example of that in particular. In the amended report, and this is at C99 of the record, the penultimate paragraph suggests that the standard of care as it applies to Dr. Katz is to perform a cytoscopy to identify and visualize the functionality of the uterus to confirm no damage or perforation. In the immediately preceding paragraph, she says, Dr. Katz documented that she had visualized both prior to closing the abdomen, and she noted that no complications were documented. So exactly the opposite of the alleged breach that Dr. Bodner herself has asserted. And these were not lost on the trial court, which recognized that the numerous instances of Dr. Bodner's inconsistencies called into question the credibility of the entire report, and frankly, underlied its decision to dismiss with prejudice, because these kinds of inconsistencies and undermining her credibility are not things that could be remedied, even with an opportunity to amend. And I'll certainly let Ms. Weiler discuss that in more detail. This was a leading stage. You referred to a credibility finding. How do you reconcile that? Well, it is within the judge's discretion to evaluate whether the 2622 report legally satisfies the requirements of section 2622. And in order to do that... What is the standard of review? The standard of review is abuse of discretion, where a court is determining the adequacy of the 2622 and the impact ultimately on whether the complaint may be filed and maintained. And in this case... And I'm sorry for interrupting, but going back to the credibility, you use the term credibility, and that's why I'm homing in on this. The court actually makes a credibility finding? I... Not in an evidentiary sense. And in fact, forgive me if I've misstated the precise language, but he certainly does identify inconsistencies. On record page 451, it points out not just deficiencies, but what I'll call internal inconsistencies. And I think that internal inconsistencies really damages the credibility of any of the statements contained within the certification. And the ultimate... And Ms. Wheeler, I'm sorry if you're reading and didn't see that your time is up. I beg your pardon. All right. Ms. Wheeler, you may proceed with your argument. Good morning. Thank you, Your Honors. As I mentioned earlier, my name is Katherine Wheeler. I represent defendant OSF in this litigation. If I may, I'd like to start by clarifying the timeline. I realize we've kind of done that a little bit. I think there's been a little bit of confusion with the specific dates, and I want to walk the court through that very quickly. So for starters, the complaint in this case was filed on August 22nd of 2022. I want to make sure the years are clear. We had a little confusion about that. It was filed in 2022. It's notable that in the record at page C196, there is a letter that was sent from Plaintiff's Counsel to OSF on August 18th of 2022. So a little less than a week before the filing of the initial complaint asking for the medical records that belong to the plaintiff in this case, which I believe is pretty standard practice. There has been some dispute, as you've heard from Plaintiff's Counsel, about whether or not he was given all of the records that are at issue. Nonetheless, the parties agreed, or excuse me, under the statute, plaintiff was given an additional 90 days to file a complete affidavit. And on November 21st of 2022, there was an attempt at filing one, but the parties also agreed that the plaintiff would be given leave an additional amount of time, 60 days at that point, to file an amended 622. None of that was disputed. None of that has been challenged. None of that has been challenged to date. On that same day, February 10th, 2023, that's the day that the day when OSF sent the additional materials, the complete set of medical records, to Plaintiff's Counsel again. It was OSF Counsel, who's Kevin Abbott, if you see Mr. Abbott's name in the records, that's to whom we are referring. OSF's Counsel had been in communication on very few occasions from Plaintiff's Counsel, both about the litigation status and also about those records. Plaintiff's Counsel is correct that during December, the plaintiff made an additional request saying we're having some issues with the medical records. And Mr. Abbott for OSF said, listen, I just want to make sure you have everything, so I'm going to send you everything. That's what was sent on February 10th of 2023. And you can see that in the record on page C215. And the reason I would ask the court, and I'm sure the court has this capability, to look at the actual electronic version in the record, because you can see how that email would have looked on a computer screen. It's very straightforward. It includes the identification of the documents that have been attached. They are all PDFs. There are three of them identified and a gigantic button that says download attachments in PDF form. This is not some sort of unusual record formatting that does require some sort of a different form of software. They're PDFs. And it's a very straightforward email that tells exactly where they are and how to download them by clicking the button. Now I recognize that Plaintiff's Counsel has said repeatedly since the appeal began, and frankly since the argument on the motions to dismiss that he was having issues with downloading those documents. But the first time that was raised as an issue was during the July 19th, 2023 hearing on the motions to dismiss. And that's the distinction that you were asking about, Justices Darman and Justice Harris. You were asking about that timing. They were sent on February 10th of 2023, and the first time Plaintiff's Counsel complained that he did not have the capability of reviewing them was July 19 of 2023, months later. This is the other reason that that amount of time and delay is crucial to the court's evaluation of whether the trial court properly exercised its discretion in dismissing this case with prejudice. Because if you review the papers that were filed on the motions to dismiss, you can see as Ms. Ferry was discussing, particularly in OSF's reply in support of its motion to dismiss, counsel for OSF specifically walked through in great detail. These are the issues with the 2622 report. These are the documents that Dr. Bonner, who authored the 622 report, claims she does not have. They are in the records, and this is what they say. All of that is pages C326 through 28 and C330, 31 of the record. It's there. There is a long discussion of this. That document was filed on June 30th of 2023. Again, the hearing in this case was July 19th of 2023. If there were some sort of issue that plaintiff's counsel were having whereby he could not identify these medical records, his experts couldn't identify these medical records, people working in his office, his staff couldn't figure out how to go through these medical records, at some point between February 10th of 2023 and the hearing on July 19th of 2023, plaintiff had the opportunity to reach out and say, I'm having an issue here. And in fact, when the court goes to look at that email at C215, that's exactly what plaintiff's counsel was encouraged to do. Quote, attached is the occurrence record for the above case, including the OSFM urology records, which plaintiff's counsel claims he did not receive. Quote, let me know if you have any questions from the paralegal. There was never any sort of an attempt at reaching out about that. Why does that matter? It matters for three reasons in this case. First of all, plaintiff never sought leave to amend and never sought assistance with any of those materials. They had ample opportunity to do so and they did not. And that is especially crucial in a case like this, where in order for the trial court to evaluate whether there is merit to the plaintiff's medical malpractice claims, because there is an additional statutory requirement of merit, in order for the trial court to evaluate that, the trial court needs to look at a proposed amendment. And none was given here. That's why the case law specifies when there is no proposed amendment offered, that of itself defeats any request for leave to file an amended complaint or an amended 2622. Relatedly, there a formal request for leave to file an amended complaint or an amended 2622. There is certainly discussion in plaintiff's response in opposition to the motion to dismiss, which was filed on June 21 of 2023, that the plaintiff may want to file an amended complaint. But if the court reviews those arguments, they are raised because plaintiffs challenging whether or not the records provided were sufficient and arguing that plaintiffs should be allowed to raise additional claims suggesting malfeasance, like spoliation of evidence and some sort of a negligent hiring and negligent credentialing claim. Ms. Weiler, may I interrupt you for a moment? Just in that regard, yours was a combined motion to dismiss, 2619 and 2615, correct? That's correct, yes. Did the court in its order address the 2615 portion? It did not. And to be clear about the basis of that, Justice Harris, it was because when you look at the 2622, the allegations against OSF of what exactly the alleged medical negligence by OSF is in this case, it's entirely unclear. You cannot identify what that is. And there are no allegations in the complaint that are substantive in any way, suggesting that Dr. Catt is OSF's agent, either actual or apparent. So that's why for OSF, this was a fundamental motion to explain to the trial court, we do not know what the allegations of negligence are in this case. Plaintiff's counsel said earlier today, they certainly understood exactly what those allegations were. Not here, not based on the allegations in the complaint, not based on the 2622. There is nothing that establishes clearly what exactly the plaintiffs are alleging that OSF did wrong. And that speaks to the purpose of 622, the policy reason we have this additional statutory requirement. It is there to ensure that before a complaint is filed, the plaintiff has consulted with a health professional to establish that this is a reasonable and meritorious claim. Again, let me, pardon me for interrupting. The 2622 report, a physician, if the complaint is based strictly on respondea superior, the physician's report is simply going to talk about the doctor, say it's a doctor who we're looking at, just identify the standard of care breach to the standard of care, and then what constitutes proximate cause. There wouldn't be any mention made by the reviewing doctor as to agency or the elements relating to respondea superior. That would be for the complaint itself, correct? That's correct. That's the distinction. Forgive me, Justice Harris, if I was not clear. It's not clear that there is an agency allegation in the complaint, and there is nothing separate that suggests medical negligence by OSF in the 622, and that leaves OSF without understanding exactly what the claims are. This case was not dismissed on a mere technicality. It was dismissed appropriately. The trial court properly exercised its discretion, and we ask that this court affirm. If there are no further questions. I don't see any. Thank you very much, Your Honors. All right. Thank you, Ms. Weiler. Mr. Kneppel, do you wish to provide a rebuttal? Yes. Yes. I know everybody has a way of looking at things, facts, and it's our job as advocates to pitch them in a manner that best helps our client, but I take exception, having been the only lawyer there in that room that day that's able to talk to you today to what she describes as to what happened in that courtroom. One thing that did happen, and I was asked about this, is why didn't you just call him again to see if you could work out this problem? And the reason is this. I had been working to try to get the first from the institutions themselves, Brandon Desnanks. Mr. Brandt was very kind. He did help us, but then he, my son and I went forth and do we bug him yet? Let's give him enough time. We reached out, I believe at the end of January. He did give me then said, I'm going to solve this problem for us. And it's like a good idea. I'm just going to give you everything again. Now it is interesting. Counsel just mentioned the button that was sent to me. I was not sent a single statement that this is going to require more than press this button. It shall take you to your documents. We did. We press that button. It took us to documents, which when we clicked on those said there were no post-operative notes. We even went into the, for OSF taking a different level to confirm that there was no error. When we saw this, and if Mr. Brandt had said, and he's a well-respected attorney and one that I do trust. If he said, I've given you everything that I'm just being irritated by saying what I don't. If you tell me you've given me everything, I'm going to trust you. It's disorganized, disheveled, but I'll do you one better and have my people here go through, try to organize it. Dr. Bordner's report definitively. And I take exception last statement. It kind of has gotten a little bit hot. There is absolutely discussion within Dr. Bordner's report about breaches of the standard of care, professional negligence being asserted. What she was, and it's clear if you read it in contact and say that I have listed all these problems, there may be more, I'm missing some documents. I may find some more I need to allege. It is true. If those records did not exist, if there were no pop-up post-operative notes, then this may have afforded plaintiff additional causes of action. To forecast additional causes of action to defendants. This is a product doctrine, attorney-client privilege communication on how to best proceed from there. But if I have a lawyer that represents this entity, and since I have everything completely, it's been given to me, I should be able to rely upon that. And we did not do formal discovery wherein I could force it through a court order or a motion to compel or an order to compel. And I was provided these documents. I have, as a sole practitioner, probably a lot more obligations I must need to take care of than these larger firms. I did the best I could. I don't think my clients should suffer because this button, when you press it, does not go to what he showed his honor in the courtroom. And I don't blame his honor in the courtroom. If he thought it was just that simple for me to click on a couple of buttons and get the information I needed. But when I went to the OSF portal and I went to the link given by defense counsel, you can go there and show you there were no post-operative reports. And that's just one example of several things that were missing. And Dr. Bordner says, if these things aren't cleared up, there may be additional causes of action, which we put in there could exist. I never said I was to assert those causes, but this gets back to a central point. I never understood why it was never talked about at that hearing. It was clear to me that the decision had been made before we walked in the room. And as dry as I might, this is going to go with the 619. 619s, I don't think are appropriate when 615 motions could be granted to allow the plaintiff an opportunity to hear technical defects. The sum and substance of what the complaints are against these doctors is in tedious detail outlined in our complaint, which I do believe is probably more comprehensive than most. That complaint is made after consultation with experts too. I'm not a doctor. We get reports from the doctor, which identifies some of what the complaints are. She supports what we're saying in this lawsuit. They don't like terms like she didn't say there's a hospital, but like you pointed out, your honor, that that is something that the lawyers decide that is not something that a hospital person would know. And then as far as the rest goes, I mean, the assumptions that are being made by defense counsel assumes everything they say is true. And it's just not, they weren't. I lived this. I did what I thought best to be polite to Mr. Abbott, give him some time at the holiday, follow back up. We even wondered how long we should wait because I don't practice law in Peoria very often. I wanted to be polite. Sorry, but you're out of time. Okay. I just don't think it's fair for me. This is my screw up that the Langston's should be hit with it, but I don't think it is. I think Dr. Borden's report is sufficient. And if it's not, six or teen should have been used instead. Thank you. We're too in this case for this to be thrown out. And I mentioned only in closing the cases that I've signed. Yes, judge. I'm sorry. All right. Thank you. Uh, thanks to all counsel here. The case will be taken under advisement. A written decision will be issued. Uh, the court stands.